Joseph W. FLEMING, et al., t/a Equity Leasing 80F, Appellants/Cross Appellees,

v.

CARROLL PUBLISHING COMPANY, Appellee/Cross Appellant.

Nos. 88–751, 88–640.

District of Columbia Court of Appeals.

Argued April 24, 1990.
Decided Oct. 26, 1990.

Christopher M. Kerns, for Joseph W. Fleming, et al.

Paul R. Smoller, for Carroll Pub. Co.

Before FERREN, STEADMAN and FARRELL, Associate Judges.

STEADMAN, Associate Judge:

This case presents several questions arising under Article 9 of the District of Columbia's version of the Uniform Commercial Code. A creditor that "leased" computer equipment and software to a user and later repossessed part of the property seeks to recover the balance due on the "lease." The issues include: (1) whether the controlling document was a "true lease" or a security agreement; (2) if a security agreement, whether the secured creditor's sale of part of the repossessed collateral without providing the requisite notice to the debtor bars the creditor from asserting rights either to a deficiency judgment or to collateral remaining in the debtor's possession; (3) if the creditor is not barred from asserting such rights, what the creditor's present rights are to the remaining collateral, which consists of computer software whose form has been significantly transformed; and (4) whether the creditor is, in any event, entitled to attorney's fees under the terms of the agreement between the parties. We uphold the trial court's rulings that the "lease" was a security agreement and that the creditor is barred from any deficiency judgment. We remand for further proceedings on the issues of the creditor's rights in the unrepossessed collateral and to attorney's fees.

## I. *The Facts*

While unusually complicated in their de-

tail,[1] the facts relevant to disposition of this appeal may be summarized as follows. On December 29, 1980, Carroll Publishing Company ("Carroll") entered into an "Equipment Lease Agreement" (the "lease" or the "agreement") with three individual investors who had formed a partnership called Equity Leasing Joint Venture—80F ("Equity"). The lease covered certain computer hardware and software. These items were acquired through third-party vendors. Some of the software was "off-the-shelf" but at least two significant software packages were to be custom-written for Carroll by a third-party vendor. The lease term was for five years, with total payments of $87,328.25.[2]

A series of difficulties of various kinds developed, and on August 25, 1982, Carroll wrote to Equity's agent terminating the agreement, on the ground of nondelivery of certain items called for by the lease. Up to that point, Carroll had made sixteen regular lease payments totaling $26,198.46. On February 22, 1983, Equity filed the instant suit against Carroll, seeking recovery in the amount of $61,930.11 and attorney's fees. Carroll counterclaimed, alleging nondelivery of some of the leased items and seeking damages for fraud and for breach of contract.

While the case was pending, on September 29, 1983, Equity's agent went to Carroll's office armed with a court order and repossessed a number of pieces of hardware and one item of software, located in the drive of one of the repossessed machines. Subsequently, at least some of the repossessed hardware was sold at a private sale, of which Carroll was given no form of notice.

Following a bench trial, the trial court denied Equity any relief. The court concluded first that the agreement was not a "true lease" but a security agreement governed by Article 9 of the District of Columbia's version of the Uniform Commercial Code. It concluded further that any claims for nondelivery were the sole responsibility of third-party vendors and not Equity;[3] hence Equity was initially within its rights in proceeding under the agreement and under Article 9. However, it held, Equity's failure to give notice to Carroll of its proposed sale of repossessed collateral barred Equity from obtaining any deficiency judgment, and any rights in the software remaining in Carroll's possession had been lost because of the subsequent modification of the software. Hence, Equity took nothing by its complaint. Nonetheless, the court interpreted the agreement to permit Equity to recover reasonable attorney's fees and costs, which it awarded in the amount of $50,636.01.

## II. Lease or Security Agreement

■ On appeal, Equity contends first that the trial court erred in concluding that the lease was not a "true lease" but a security agreement governed by Article 9 of the District of Columbia Uniform Commercial Code. D.C.Code §§ 28:9–101 to 28:9–507 (1989). District of Columbia Code § 28:1–201(37) (1989) provides, in pertinent part:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation.... Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest".... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon

---

1. The trial court's comprehensive Opinion and Order under review consists of 58 pages.

2. The lease did not provide for Carroll to purchase the equipment. In a subsequent Purchase Agreement of January 25, 1981, however, the parties agreed that "Buyer [Carroll] is hereby given the first right to purchase the Equipment at the estimated fair market value of 10% of the original value (see below) [.] Said purchase

shall occur upon expiration of the lease." In addition, the Purchase Agreement provided that a "demand for purchase of the Equipment may be made by Equity or its successor or assigns at any time after the date hereof."

3. Carroll conceded at trial that its counterclaim for breach of contract would not properly lie if the court found the parties' agreement to be governed by Article 9.

compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Thus, in determining whether a lease is a "true lease" or an Article 9 security agreement, the trial court must look to the intent of the parties, which depends on "the facts of each case." The trial court's determination as to the intent of the parties is essentially one of fact, *cf. Dodek v. Cf. 16 Corp.,* 537 A.2d 1086, 1093 (D.C.1988) ("the question of what the parties intended [by their contract] is clearly a question of fact" (internal quotation marks omitted)), and will not be upset unless it is "plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (1989). Here, the trial court recognized that the intent of the parties is essential to a determination of whether a lease is a "true lease" or security agreement and the court detailed its reasons for finding that the parties intended the lease as a security agreement. In particular, the court noted that the lease allocated to Carroll several burdens typically associated with ownership of property, such as the obligation to pay license fees and taxes on the equipment, the obligation to keep the equipment in good repair and the assumption of "the entire risk of loss of and damage to Equipment from any and every cause whatsoever." In addition, the court noted that Equity's status was as financier, rather than manufacturer or seller, and that Equity had no storage facilities for the equipment. These are among the "factors" courts use in determining whether a lease is "intended for security." 2 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL

CODE § 23–3, at 251–52 (3d ed. 1988) (hereinafter, "WHITE & SUMMERS").[4] The court also noted that the total price Carroll was required to pay under the lease exceeded the purchase price of the equipment by $29,028.00 and that the customized system would be of little value to other potential lessees. "Under the totality of the evidence presented," the court found that the parties "intended to create a security agreement." We cannot say that this finding is "plainly wrong or without evidence to support it."

## III. *The Secured Creditor's Rights*

### A. Deficiency Judgment

Equity contends next that, even if the lease was a security agreement, the trial court erred in barring Equity from obtaining a deficiency judgment. D.C.Code § 28:9–504 provides:

(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing....

. . . . .

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts.... Unless collateral is perishable or threatens to decline speedily in value or is a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if, except in the case of consumer goods, he has not signed after default a

4. The lease itself did not provide Carroll an option to purchase; a Purchase Agreement dated less than a month later did. *See supra* note 2. The trial court viewed the option to purchase contained in the Purchase Agreement as modifying the original contract "and that, accordingly, the parties' intent is to be determined on the basis of the lease, as modified by the purchase agreement." However, because the trial court could not say that the option to purchase was "for no additional consideration or for nominal consideration," D.C.Code § 28:1–201(37), it looked to the "other factors" to conclude that

the lease was a security agreement. The absence of an option to purchase for nominal consideration does not, of course, necessarily render the lease a "true lease." 2 WHITE & SUMMERS, *supra* § 23–3, at 251; *In re Brookside Drug Store, Inc.,* 29 U.C.C.Rep.Serv. 230, 234 (Callaghan) (Bankr.D.Conn.1980). *See generally* Leary, *The Procrustean Bed of Finance Leasing,* 56 N.Y.U.L.REV. 1061, 1069–76 (1981); Coogan, *The New UCC Article 9,* 86 HARV.L.REV. 477, 528 (1973); Note, *A Lease by Any Other Name: Or When Is a Lease a Conditional Sale?,* 44 B.U.L. REV. 103 (1964).

statement renouncing or modifying his right to notification of sale. .

Paragraph 11 of the lease. provides that if Carroll defaults in its payments,

> the full amount of rent then unpaid hereunder shall become due and payable forthwith at the election of Lessor and Lessor may, (A) at its option, without notice or demand and without legal process, take possession of Equipment wherever it may be located (with all additions and substitutions) whereupon all rights of Lessee in Equipment shall terminate absolutely, and (i) retain Equipment and all prior payments of rent, or (ii) retain all prior payments and either sell Equipment (applying net proceeds to balance of rent) or retain Equipment (crediting Lessee reasonable value), Lessee remaining liable for any deficiency....

To the extent that paragraph 11 of the lease can be read to permit Equity to sell repossessed equipment without giving the statutory notice to Carroll, it is unenforceable under D.C.Code section 28:9–501(3)(b), which states that the notice rules of section 9–504(3) "may not be waived or varied," although the parties "may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable." *See Prescott v. Thompson Tractor Co., Inc.,* 495 So.2d 513, 517 (Ala.1986) (UCC section 9–501(3) "precludes waiver" by a debtor of the right to notification of the disposition of collateral"); *see also Gavin v. Washington Post Employees Fed. Credit Union,* 397 A.2d 968, 972 (D.C.1979) (implying that waiver or variance may not be effected by security agreement itself but may be by the parties' subsequent transactions); UCC § 9–504 of-

ficial comment 5 (1978) (waiver or modification may occur only when "debtor has after default signed a statement renouncing or modifying his right to notification of sale"). Neither party argues that Carroll waived or varied its right to notice of sale following default.[5]

Although D.C.Code section 28:9–504(3) does not prescribe the consequences of a secured creditor's failure to notify the debtor of a proposed sale of repossessed property, we addressed this precise issue in *Randolph v. Franklin Investment Co.,* 398 A.2d 340 (D.C.1979) (en banc). In *Randolph,* the creditor repossessed the debtor's automobile when the debtor failed to make timely payments on the automobile and the creditor sold the automobile for scrap at a private sale of which the debtor was not given notice. *Id.* at 342. The creditor then sought a deficiency judgment, which the trial court awarded. *Id.* We reversed, holding broadly that "by failing to give the required notice [of] the private sale, the creditor ... is not entitled to a deficiency judgment; its recovery is limited to the proceeds of the private sale." *Id.* at 343. We noted that the notice requirement serves the two purposes of affording the debtor an opportunity to redeem the repossessed collateral before the sale and permitting the debtor to monitor the sale so as to be able to defend properly against a deficiency action.[6] *Id.* at 345. "Because of the substantial prejudice to debtors in the absence of notice of resale," we concluded, "especially when compared to the ease with which any creditor can comply with the notice requirements, we adopt [the] strict rule" that failure to provide notice bars recovery of a deficiency judgment. *Id.* at 347. Our decision in *Randolph* was sup-

---

5. Equity argues to us on various factual grounds (such as substitution) that none of the repossessed items was in fact subject to the security interest created by the "lease," and hence that the lack of notice was irrelevant. By its original ruling, however, the trial court necessarily found the facts to be to the contrary, and expressly rejected this argument in denying Equity's motion to amend. Equity's assertion that the notice provision is applicable only to repossession under perfected security interests is plainly wrong. As the ban on deficiency judgments indicates, the notice provision mainly ap-

plies to the debtor-creditor relationship; the concept of perfection relates to a creditor's rights against third parties. Equity also asserts that Carroll retained some hardware subject to Equity's security interest. Whether true or not, this fact is irrelevant to the disposition of this appeal.

6. With respect to the second purpose, we noted that realistically, in the event of a private sale, "the opportunity to monitor the private sale is not likely to be available." *Id.* at 346.

ported also by D.C.Sup.Ct.Civ. Rule 55–II(b) (1989), which states, in pertinent part, that "[n]o deficiency judgment after repossession of personal property shall be granted unless it shall appear to the satisfaction of the Court by proper evidence that said plaintiff complied with applicable law."

This jurisdiction has thus adopted the "absolute preclusion" or "absolute bar" approach regarding deficiency judgments. The "absolute preclusion" approach "simply denies the secured party [who has failed to give notice of the sale] a deficiency judgment, regardless of the adequacy or inadequacy of the price obtained for the collateral." 1A P. COOGAN, W. HOGAN, D. VAGTS, J. MCDONNELL, SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE § 8.06[2], at 8–119 (BENDER'S UNIFORM COMMERCIAL CODE SERVICE (1990) (hereinafter, "P. COOGAN"); *see also* 9 R. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 9–504:96, at 789–90 (1985). The "absolute preclusion" approach is to be distinguished from the "rebuttable presumption" approach, which "will allow a deficiency only to the extent of the collateral and the obligation secured, if the secured party can overcome a rebuttable presumption that the value of the collateral is equal to the obligation secured." 1A P. COOGAN, *supra* § 8.06[2], at 8–120. The jurisdictions are deeply divided in choosing between the "absolute preclusion" and "rebuttable presumption" approaches. 1A P. COOGAN, *supra* § 8.06[2] & nn. 9 & 10, at

8–119 to 8–120; 2 WHITE & SUMMERS, *supra* § 27–19, at 624. We are bound under *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971), however, to follow the "absolute preclusion" approach adopted in *Randolph*, *supra*.

∎ Equity contends, as a general matter, that *Randolph*, as well as *Gavin*, *supra*, and *Commercial Credit Corp. v. Lloyd*, 12 U.C.C.Rep.Serv. 15 (Callaghan) (D.C.Super.Ct.1973), all of which involved repossession and sale without notice of debtors' automobiles, is inapplicable to the present case because it occurred in a consumer, as opposed to a business,[7] context. While it is true that these cases occurred in a consumer context, we find no indications in them that the "absolute preclusion" rule was not to be applicable across the board. Quite to the contrary, we specifically said in *Randolph* that "the rule of law governing the legal consequences to a secured creditor for failure to give the requisite notice of resale must be uniform for *all* creditors, based on the range of *commercial* practices realistically to be anticipated." 398 A.2d at 346 (emphases added). Nor do we find any indication that other states adopting the "absolute preclusion" rule have been inclined to follow the "rebuttable presumption" approach in business contexts.[8] In *Randolph*, the en banc court was interpreting a provision of the Uniform Commercial Code applicable to every sort of transaction and made a clear choice between two conflicting rules of law.

---

**7.** The word "commercial" is often used to contrast with the word "consumer." Difficulty is created, however, by the fact that the statute is termed the "Uniform Commercial Code," D.C. Code § 28:1–101, and is applicable to the whole range of transactions. In this opinion, therefore, we use the word "business" rather than "commercial" in this context.

**8.** Equity cites *United States v. Whitehouse Plastics*, 501 F.2d 692 (5th Cir.1974), and *Westgate State Bank v. Clark*, 231 Kan. 81, 642 P.2d 961 (1982), to support its contention that we should recognize a consumer/business distinction. These cases are inapposite, however. The federal court in *Whitehouse Plastics* rested its decision generally on the "rebuttable presumption" rule, stating that "[w]e believe [it] to be the better rule and the one which Texas would adopt." 501 F.2d at 695. The court only inci-

dentally mentioned that "the transactions were commercial dealings between reasonably experienced businessmen." *Id.* at 696. The court in *Westgate* recognized a distinction between commercial and consumer transactions but only because of the existence in Kansas of the Uniform Consumer Credit Code, which specifically provides for an absolute bar to deficiency judgments where the creditor in a consumer transaction has failed to notify the debtor of the sale. 231 Kan. at 84–86, 88–90, 642 P.2d at 965, 968. When the debtor is a commercial entity and the UCC, not the UCCC, applies, the court decided that the "rebuttable presumption" rule should apply. *Id.* at 90, 642 P.2d at 968. As in *Whitehouse Plastics*, the court was essentially adopting the "rebuttable presumption" rule rather than making a distinction between consumer and business transactions under the "absolute bar" rule.

The policies underlying the rule as stated in *Randolph* are not essentially different in a business context. Sitting as a panel, we see no basis for drawing the distinction urged by Equity here.

■ It is true that the present case is somewhat unusual in that Equity did not repossess all the collateral in Carroll's possession, nor, apparently, did it sell all the collateral it did repossess.[9] The trial court correctly held that these facts did not thereby entitle Equity to a deficiency judgment to which it was not otherwise entitled. While a secured creditor ordinarily has the right to sue on the debt as well as proceed against the collateral, D.C.Code § 28:9–501(1), if he proceeds against the collateral, he is obligated to follow the applicable rule for its disposition. At least under the circumstances here,[10] a failure to do so acts as a bar to any deficiency judgment, whatever rights the creditor may retain in the collateral itself. Case law from other jurisdictions supports this conclusion. In *DeLay First National Bank & Trust Co. v. Jacobson Appliance Co.*, 196 Neb. 398, 243 N.W.2d 745 (1976), the creditor repossessed several lots of collateral, with respect to one of which he failed to give proper notice of sale. The court barred a deficiency judgment in its entirety. It reasoned that

> the intent of the Uniform Commercial Code would appear to mandate that the entire disposition of collateral by the secured party be viewed as one transaction, and that every aspect of that transaction be in accord with the requirements of the Uniform Commercial Code. To adopt any other rule would place upon the court the sometimes impossible and time-consuming task of attempting to determine the amount of recoverable deficiency as well as the amount of unrecoverable deficiency.

196 Neb. at 408, 243 N.W.2d at 751; *see also Thomas v. Sutherland*, 370 So.2d 12 (Fla.Dist.Ct.App.1979) (no deficiency judgment permitted where only part of pledged corporate assets sold).

Although Equity lost its rights to a deficiency judgment, it does not follow that it has lost rights in the remaining collateral, and especially to the collateral not repossessed, *viz.*, the bulk of the "leased" software. We turn to this issue.

### B. Unrepossessed Collateral

■ Even if barred from a deficiency judgment, Equity seeks in the alternative to assert rights against the unrepossessed balance of the software in Carroll's possession subject to the security agreement. We do not think that a bar to a deficiency judgment in itself constitutes any obstacle to the enforcement of a security interest in any collateral remaining in the debtor's possession. The policies underlying the "absolute preclusion" rule do not militate against such a result. It is one thing to deny a creditor a right to proceed against a debtor for an alleged balance owing after the debtor has been stripped of all the property securing the debt. It would be quite another to permit a debtor to continue to possess, indeed as a practical matter to own outright, a portion of the collateral although the debt remains unpaid. This would be especially unjust in the case of a debt securing, in effect, the unpaid balance of the purchase price of the collateral, as here.[11]

Thus, in *In re Gerber*, 51 B.R. 526 (Bankr.Neb.1985), a bank loaned money to the individual debtors and took a security interest in the debtors' truck and mobile home. *Id.* at 527. Following default, the

---

**9.** Equity does not argue that this latter fact has any bearing on its right to a deficiency judgment *vel non.*

**10.** The lease itself does not distinguish between the individual items of hardware and software either as to original purchase price or in allocation of the rental payments, nor did the proof at trial significantly elucidate any individualized pricing of the collateral.

**11.** Consider, for instance, a situation where two automobiles are purchased on an installment basis. The debtor defaults having made no installment payments. Automobile A is repossessed and sold without giving the requisite notice. If the repossessing creditor loses all rights, the debtor would be permitted to retain the second automobile as his own although almost entirely unpaid for.

creditor repossessed the mobile home and sold it without notice to the debtors. *Id.* The creditor then sought to recover the truck to settle the debt. *Id.* at 528. The United States Bankruptcy Court concluded that such a repossession was permissible. This was not a case, the court noted, where the creditor was seeking a deficiency judgment, *id.* at 529,[12] which would not be allowed under Nebraska's "absolute preclusion" rule. But the creditor was permitted to recover "the collateral it bargained for." *Id.*

While the trial court apparently agreed with this general principle of law,[13] it nonetheless refused to grant any relief to Equity with respect to the unrepossessed software. Its reasoning in doing so is not entirely clear, but appears to have rested on a puzzling interpretation of Equity's rights. The court stated: "Under the terms of the parties' agreement, Equity would have been entitled to any modifications made to the equipment [14] at Carroll's expense during the lease term. Equity is not, however, entitled to any replacements or modifications made after the lease was terminated."

 We are unable to ascertain upon what basis the trial court made such a distinction between changes in the form of the collateral made prior to and subsequent to the termination of the lease. To the extent that the security agreement gave

Equity any rights in the software as its form permutated, those rights should remain the same before and after default. While Equity, proceeding as if the lease were a true lease, may have based its right to take the property upon a "termination" of the lease, the fact that the lease was in reality a security agreement meant that the creditor's Article 9 security interest in the unrepossessed collateral continued until the debt was paid, absent an express or implied relinquishment of the security interest.[15] Carroll cannot fairly assert that the "lease" was a security interest for purposes of determining the effect of Equity's failure to give notice of sale upon repossession but not for purposes of determining Equity's rights upon "termination."

The trial court's view as to Equity's limited rights in the software apparently affected its view of the available relief. It observed that "the software covered by the lease had been so substantially *revised* during the three years following Carroll's default with it no longer existed in an identifiable form and thus could not be returned to Plaintiffs." If Equity had no rights in post-default modifications of the software, it might well be correct that "it" (*i.e.,* the collateral as it existed at the time of default) no longer could be delivered to Equity, and, likewise, that at the time of the Order, the Court had no way of ascertaining what software "covered by the original

---

12. A *deficiency judgment, strictly speaking, is* "the finding of personal liability upon a debtor for the unpaid balance of a secured debt after disposition of the collateral fails to provide proceeds sufficient to satisfy the underlying debt." *Id.* at 529 (citing *In re Pittsburgh–Duquesne Dev. Co.,* 482 F.2d 243, 246 (3d Cir.1973)).

13. It may be that the full sweep of the principle was not in fact applied. The Order states: "Plaintiffs are, however, entitled to recover possession of any equipment withheld by Carroll during Equity's effort at repossession in September, 1983." There is no requirement, however, that a secured creditor repossess at one time all property subject to a security interest whether or not "withheld." That is not to say that failure *to repossess certain property may not constitute* a "waiver" of rights therein. *See infra* note 15.

14. We understand the use of the word "equipment" here to encompass the software. The court did not identify that part of the lease

entitling Equity to "replacements or modifications." Presumably, the court had in mind paragraph 4, which provides in pertinent part: "All equipment, accessories, parts and replacement [*sic*] for or which are added to or become attached to Equipment shall immediately become the property of Lessor and shall be deemed incorporated in Equipment and subject *to the terms of this Lease as if originally leased* hereunder."

15. The facts as finally determined may indicate that in fact Equity by its actions at the time of repossession effectively determined to abandon any security interest it had in the collateral not repossessed in September 1983 or is otherwise estopped to make any claim to the unrepossessed property. That issue remains open on remand.

lease" still exists.[16] But these conclusions are brought into serious question since they seem to be an outgrowth of the unsupported assumption that Equity had no rights to any "replacements or modifications" occurring after the termination of the lease.[17]

Accordingly, the case must be remanded for further consideration by the trial court of what rights, if any, Equity may still have with respect to the unrepossessed collateral, including replacements and modifications.[18]

## IV. *Attorney's Fees*

As cross-appellant, Carroll contends that the trial court erred in awarding attorney's fees and costs to Equity. Paragraph 11 of the lease agreement provides: "Should Lessee fail to pay any part of the rent herein reserved or any other sum required to be paid by Lessee to Lessor hereunder, Lessee shall pay Lessor interest on such delinquent payment ... and expenses of collection, including reasonable attorneys' fees." Without discussion, the trial court held flatly, in holding Equity generally entitled to attorney's fees, that "[t]his provi-

sion is not rendered unenforceable by the Court's decision barring Plaintiffs from recovery of a deficiency judgment." The court amplified the grounds of its ruling to some extent in the subsequent order determining the amount of attorney's fees. In that order, the trial court stated that "[d]espite this Court's judgment on the merits of his case, Plaintiffs' claims cannot be said to be either frivolous or brought in bad faith." The court concluded that with certain limited exceptions,[19] it had "no basis (save its own discomfort with the size of the claim) for not accepting [Equity's] certifications made through counsel as to attorney fees." Accordingly, the court awarded fees and costs in the amount of $50,636.01.

■ While the bar to a deficiency judgment may not in itself have rendered "unenforceable" the contractual provision for attorney's fees, the court apparently proceeded as if the bar were irrelevant and effectively awarded the plaintiff the great bulk of the attorney's fees requested. Yet, in its attempt to recover the outstanding debt, the plaintiff appears in fact to have been largely unsuccessful.[20]

---

**16.** Immediately following its holding that Equity was not entitled to any post-termination replacements or modifications, the court stated: "From the evidence before it, the Court has no way of ascertaining what, if any, software covered by the original lease still exists and thus cannot order its return." The same difficulty inheres in the court's reiteration in its denial of Equity's motion to amend that the court could not "determine what existing software contains elements of Plaintiff's programs."

**17.** Equity alternatively argues that the doctrines of "accession" and "commingling" may be relevant to a resolution of its rights. *See* D.C.Code §§ 28:9–314 and 9–315. These doctrines, including the definition of "goods," have an intense factual component and are best left to further consideration by the trial court on remand, to the extent they may bear on resolution of the issue. Section 9–315 understandably speaks of "perfected" security interests since it is located in that portion of Article 9 dealing with rights of third parties. The concept of "commingling," however, is a general property principle. *See* 1 AM.JUR.2D *Accession and Confusion* §§ 15–24 (1962).

**18.** If the revisions to the form of the collateral subsequent to the termination of the lease were in breach of the security agreement or otherwise wrongful on the debtor's part, Equity

would not necessarily be precluded from recovering the value of the unrepossessed collateral, any less than if the debtor following repossession of part of the collateral had deliberately or negligently destroyed the remaining unrepossessed collateral. However, we note that the trial court in its Order stated that while Equity asserted in a post-trial memorandum that it was entitled to a money judgment for the value of the retained software, it had not "presented sufficiently exact evidence of the software's value to enable the court to make such an award." Further, the court noted, Equity had dropped its claim of wrongful conversion. These facts, depending on their precise content, may preclude a second bite at the apple.

**19.** The court disallowed $3,880.00 incurred in preparing jury instructions and *voir dire* questions, since the right to a jury trial was waived in the lease, and $2,262.50 of "excessive" fees incurred in preparing the fee submission. The court disallowed for various reasons an additional $1,142.50 for miscellaneous fees and costs.

**20.** It is true that the litigation was commenced at a time long prior to any repossession, and that the repossession itself took place pursuant to a court order. The degree to which the court

It is generally understood that the degree of success in litigation is a relevant factor in the award of attorney's fees. Statutes awarding attorney's fees normally limit such a right to the "successful" or "prevailing" party. *See* 2 S. SPEISER, ATTORNEYS' FEES § 14:2 (1973) (hereinafter "SPEISER"); H. NEWBERG, ATTORNEY FEE AWARDS § 1.05, at 7 (1986) (hereinafter "NEWBERG").[21] The same general concept seems to be applied ordinarily in the interpretation of contractual provisions for attorney's fees. In *Nolan v. Nolan,* 568 A.2d 479 (D.C.1990), a separation agreement permitted the wife recovery of attorney's fees "reasonably and necessarily incurred by the Wife to enforce the terms of this Agreement." *Id.* at 489. We noted, however, that "[o]f course ... any award of fees to [the Wife] under the agreement is contingent upon her prevailing on the merits of her suit." *Id.* at 489. Recently in *King v. King,* 579 A.2d 659 (D.C.1990), dealing with the award of attorney's fees under a separation agreement, we reaffirmed that among the factors to be considered are " 'the necessity for the services' " and " 'the results obtained from the services.' " *Id.* at 664 (quoting *Steadman v. Steadman,* 514 A.2d 1196, 1200 (D.C. 1986)).

A similar principle operates when a defendant's counterclaim reduces or eliminates a plaintiff's right to recovery. "In cases involving a counterclaim which operates to lessen, but not extinguish, the plaintiff's recovery, it has been held that the amount of attorneys' fees allowable under

a contract provision or stipulation should be commensurately reduced." 2 SPEISER, *supra* § 15:15, at 314, and cases cited. Where the counterclaim exceeds the amount due, the majority of courts agree that the plaintiff may recover no fees at all under the contract. *Id.* at 313–14. *See* Annotation, *Recovery of attorneys' fees provided for in bill, note, or similar evidence of indebtedness, as affected by opposing party's recovery,* 41 A.L.R.2d 677, 678 (1955).

Even where a contractual provision is interpreted as allowing for the award of attorney's fees in unsuccessful actions, "where the merit or necessity of the creditor's claim or defense is successfully challenged, courts may decline to enforce attorney's fee provisions." *Manchester Gardens v. Great West Life Assur. Co.,* 92 U.S.App.D.C. 320, 326, 205 F.2d 872, 878 (1953).[22] Indeed, in *Wisconsin Avenue Associates, Inc. v. 2720 Wisconsin Avenue Cooperative Association, Inc.,* 441 A.2d 956 (D.C.), *cert. denied,* 459 U.S. 827, 103 S.Ct. 62, 74 L.Ed.2d 64 (1982), we held that an attorney's fee provision that required payment of attorney's fees regardless of the outcome of any litigation was impermissibly broad and unenforceable, at least in the circumstances of that litigation. *Id.* at 965.

We recognize that in order to recover attorney's fees, even with statutes allowing their award only to a prevailing party, the claimant need not necessarily recover all

order was required to effect repossession is not before us. "In taking possession [of collateral] a secured party may proceed without judicial process if this can be done without breach of the peace." D.C.Code § 28:9–503. Furthermore, it may be determined on remand that Equity has enforceable rights with respect to the collateral still in the possession of the debtor.

21. Likewise, "in determining the reasonable value of services rendered by attorneys under a statutory provision authorizing recovery thereof in a particular class of actions, the court will consider [*inter alia,*] the result of the suit." 1 SPEISER, *supra* § 12:102, at 598.

22. The court in *Manchester Gardens* cited as support the case of *Tyler v. Walker,* 101 Tenn. 306, 47 S.W. 424 (1898). In *Tyler,* the court held

that where a promissory note provided that "if suit is brought on this note, [debtor] will pay all attorney's fees and costs of collecting," an attorney's fee was nonetheless not collectible "when suit is needlessly brought, or when it is brought to enforce an unjust demand, or to coerce more than is actually and justly due." 101 Tenn. at 308–09, 47 S.W. at 424. For a recent reiteration of the principle, see *Singer v. Shannon & Luchs Co.,* 250 U.S.App.D.C. 269, 271, 779 F.2d 69, 71 (1985) (subsequent history omitted) ("it is clear that even when a party is entitled to attorneys' fees under the terms of a contract, it may nonetheless be denied an award if it is unsuccessful on the merits of its claim").

the relief sought.[23] NEWBURG, *supra* § 3.02, at 110 (partially successful plaintiffs are entitled as a threshold matter to an award of attorney's fees, though limited success may be taken into consideration by the court in determining what constitutes a reasonable fee"); *Texas State Teachers Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989) (permitting recovery of attorney's fees under 42 U.S.C. section 1988 to parties that only partially prevailed in their lawsuit); *Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983) (same); *District of Columbia v. Jerry M.*, 580 A.2d 1270, 1274 (D.C.1990). In such cases where a party is only partially successful, the trial court must exercise its discretion to determine what amount of fees, if any, should be awarded. *Hensley, supra,* 461 U.S. at 436–37, 103 S.Ct. at 1941; *see Texas State Teachers Ass'n, supra,* 109 S.Ct. at 1491–92 (summarizing approach elaborated in *Hensley* that trial court should use in determining appropriate fee award).

We are not for a moment unmindful of the sound principle that "'a request for attorney's fees should not result in a second major litigation,'" *Pierce v. Underwood,* 487 U.S. 552, 563, 108 S.Ct. 2541, 2549, 101 L.Ed.2d 490 (1988) (quoting *Hensley, supra,* 461 U.S. at 437, 103 S.Ct. at 1941), nor that we deal here with interpretation and application of a contractual, rather than a statutory, provision. Nevertheless, in light of the foregoing discussion, we think that the trial court's explanation of its decision to make this sizeable attorney's fee award is too slim to support an affirmance at this point. *Cf. Duggan v. Keto,* 554 A.2d 1126, 1142–43 (D.C.1989) (remanding for further explanation of attorney's fee award); *Swift v. Swift,* 566 A.2d 1045, 1047 n. 2 (D.C.1989) (per curiam) (reiterating requirement of our decisions "for detailed findings supporting an award of attorney's fees"). On remand, the trial court will have the opportunity to further consider and amplify this aspect of the judgment.

**23.** *See supra* note 20.

The case is remanded for further proceedings consistent with this opinion.

*So ordered.*