Joseph G. FLEMING, et al., Appellants,

v.

CARROLL PUBLISHING CO., Appellee.

No. 91–CV–627.

District of Columbia Court of Appeals.

Argued Dec. 3, 1992.
Decided March 9, 1993.

Christopher M. Kerns, Bethesda, MD, for appellants.

Paul R. Smollar, Washington, DC, for appellee.

Before FERREN, SCHWELB and FARRELL, Associate Judges.

FERREN, Associate Judge:

This appeal concerns a dispute over the security interest of appellants, Joseph W. Fleming *et al.*, trading as "Equity 80–F" (Equity), in computer hardware and software they "leased" to appellee Carroll Publishing Co. (Carroll). Appellants contend the trial court erred in ruling that Equity (1) was barred from seeking a deficiency judgment for the amount of the contract payments attributable to the software, (2) had abandoned any security interest in the software remaining in Carroll's possession, and (3) was not entitled to any attorney's fee, either under the contract or under Super.Ct.Civ.R. 11. We affirm the trial court's ruling on the first issue. However, because we conclude as a matter of law that, under the circumstances of this case, Equity did not lose its security interest in the software, we reverse on the second issue and remand this case to the trial court for further proceedings concerning attorney's fees and other appropriate remedies.

## I.

The facts are detailed in this court's opinion in an earlier appeal by the same parties,

*Fleming v. Carroll Publishing Co.*, 581 A.2d 1219 (D.C.1990) (*Fleming I*). Briefly, Equity agreed to finance Carroll's acquisition of computer hardware and software from a third-party vendor, Information Sciences Corporation (ISC), in return for a series of "lease" payments to be made over a five-year term, commencing December 29, 1980. On August 25, 1982, Carroll terminated the "lease" agreement on the ground that the vendors had failed to deliver certain items of hardware and software, as provided for in the agreement. In the termination letter Carroll also notified Equity's agent that "the equipment" in Carroll's possession was available to be picked up.

In response, Equity filed suit against Carroll on February 22, 1983, declaring that Carroll had defaulted on the "lease" agreement and seeking recovery of the remaining amount to be paid on that contract plus costs, including attorney's fees. In its answer and counterclaim, Carroll alleged, among other things, that Equity had no enforceable security interest under the agreement because the equipment had never been delivered.[1] On June 27, 1983, Equity moved for an order directing Carroll to return to Equity all equipment covered by the agreement. Attached to this motion was a listing of the leased equipment then in Carroll's possession, including both hardware and software. Carroll responded by stating its willingness to turn over the hardware, omitting any mention of the software. The trial court then issued an order on August 4, 1983, granting Equity's motion and ordering Carroll to deliver within 30 days "the equipment listed upon the documents filed in conjunction with the motion for return of equipment." On September 29, 1983, an Equity representative arrived at Carroll with the order in hand.

Carroll turned over several items of hardware but did not deliver any software, except for one disk that happened to be in the disk drive of one of the computers repossessed by Equity. Nor did Equity's representative specifically request the return of any software. In the course of 1984, Equity sold several of the repossessed hardware items without notice to Carroll.

On April 18, 1985, while still waiting for trial on its complaint for damages on the contract, Equity filed a motion for contempt against Carroll for its failure to return the software specified in the earlier court order. In response, Carroll asserted that it had fully complied with the court order for return of the "equipment," which meant only hardware, not software. The trial on Equity's complaint for breach of contract did not begin until September 9, 1985. Arguments on Equity's contempt motion were also heard at trial. The parties made their final arguments on October 1, 1985, and submitted post-trial briefs on October 11, 1985. The trial court issued its decision on September 22, 1987.

In *Fleming I*, we affirmed the trial court's rulings that (1) the "lease" contract between the parties was in fact a security agreement under the provisions of Article 9 of the Uniform Commercial Code, D.C.Code §§ 28:9–101 through 9–507 (1989), and (2) Equity's failure to give Carroll advance notice of the sale of repossessed property, in violation of D.C.Code § 28:9–504, barred Equity from seeking a deficiency judgment[2] against Carroll. 581 A.2d at 1222–25. We added, however, that the bar to the deficiency judgment did not necessarily preclude Equity from seeking to repossess the software collateral remaining in Carroll's possession. *Id.* at 1225. More specif-

---

1. Carroll had previously filed suit against ISC on August 18, 1982, alleging breach of contract and breach of warranty. Carroll also named ISC as a third-party defendant in the suit between Equity and Carroll. The trial court later granted Carroll's motion to consolidate both suits. It appears that ISC filed for bankruptcy sometime in the fall of 1983; a default judgment was entered against ISC on April 10, 1984. In Equity's action against Carroll, the trial court ultimately held that responsibility for delivery rested on ISC, that Equity was not ISC's agent, and that, therefore, Equity could not be held liable for any nondelivery of promised hardware and software.

2. Because the "lease" agreement was actually a security agreement and Equity had already repossessed and sold the hardware collateral, the trial court treated Equity's breach of contract suit as a suit for deficiency judgment.

ically, we concluded that "the fact that the lease was in reality a security agreement meant that the creditor's Article 9 security interest in the unrepossessed collateral continued until the debt was paid, absent an express or implied relinquishment of the security interest." *Id.* at 1226. At the same time, however, we did not directly rule on Equity's rights to the remaining software, noting:

> The facts as finally determined may indicate that in fact Equity by its actions at the time of repossession effectively determined to abandon any security interest it had in the collateral not repossessed in September 1983 or is otherwise estopped to make any claim to the unrepossessed property.

*Id.* at 1226 n. 15.

Accordingly, we remanded the case for the trial court to determine what rights, if any, Equity retained in the remaining unrepossessed property. We also asked the trial court to reconsider the attorney's fees the trial court had awarded to Equity on the basis of a contractual provision between the parties. We said that, even where the asserted right of attorney's fees is contractually based, "the degree of success in litigation is a relevant factor in the award of attorney's fees." *Id.* at 1228. Because Equity "appear[ed] in fact to have been largely unsuccessful" in its suit on the debt, *id.* at 1227, we questioned the trial court's decision to award substantially all of Equity's claimed fees.

In an Opinion and Order dated March 29, 1991, the trial court found that Equity had voluntarily relinquished all rights to any software remaining in Carroll's possession. By failing to ask for the return of the software until more than two and one half years after Carroll's default, the court said, Equity had abandoned its interest in this security.[3] The court refused to credit Equity's excuse that it delayed in asserting its ownership because it did not know that Carroll possessed the software. The court also relied on a finding that the software

was of doubtful economic value to Equity. Furthermore, the court ruled that Equity could not seek the alternative remedy of a monetary judgment for the remainder of the contract payments attributable to software costs. In the trial court's opinion, "[t]he absolute bar rule [announced by this court in *Fleming I*] preclude[d] a deficiency judgment with respect [to] a portion of the debt just as it had prevented Equity from collecting on the whole debt." Finally, the court ruled that Equity was not entitled to any attorney's fees because "Equity lost this litigation in almost every respect." As for Equity's claim for attorney's fees as a sanction for alleged Rule 11 violations, the court determined that Equity had failed to preserve this issue in the original trial proceeding. Equity now challenges these rulings.

## II.

Equity argues that the trial judge ignored this court's opinion in *Fleming I* when he ruled that Equity was precluded from seeking a deficiency judgment even for that portion of the contract payments attributable to the software. This contention is mistaken. *Fleming I* held that where, as in this case, the various items of collateral are all the subject of a single transaction and are not identified or priced individually, the failure to comply with the requirements for disposition of repossessed property bars *any* further deficiency judgment. 581 A.2d at 1225 & n. 10. The fact that Equity had not actually repossessed the software and might have disposed of it in a separate transaction is irrelevant. *See DeLay First Nat'l Bank & Trust Co. v. Jacobson Appliance Co.*, 196 Neb. 398, 243 N.W.2d 745, 751 (1976) (holding that even where there are several sales of collateral, some valid and others invalid under Article 9, a deficiency judgment is, nonetheless, barred with respect to the entire debt; the U.C.C. does not mandate distinctions between recoverable deficiency and unrecoverable deficiency), *cited in Fleming I*, 581

---

3. As we noted above, although the repossession order listed the software, as well as hardware, components, the trial court found that Equity's

agent did not specifically request the return of the software when he repossessed the hardware.

A.2d at 1225. As we discuss below, however, this does not necessarily mean that Equity is barred from seeking judgment for the value of the software itself.

### III.

■■ We consider next the trial court's conclusion that Equity had voluntarily relinquished its rights in the software. This is a mixed question of fact and law, insofar as it involves the interpretation of Equity's intent—an essentially factual issue—in light of the legal standard for determining a secured creditor's waiver of rights in collateral under U.C.C. Article 9. Thus, while it is generally true that we defer to the trial court's finding regarding intent and will not upset that finding unless it is "plainly wrong or without evidence to support it," D.C.Code § 17–305(a) (1989 Repl.); *see Fleming I,* 581 A.2d at 1222, or "clearly erroneous," Super.Ct.Civ.R. 52(a), we review de novo the legal foundation for that finding. *See Davis v. United States,* 564 A.2d 31, 35–36 & n. 2 (D.C.1989) (en banc). Because we disagree with the trial court's choice of legal standard in this case, we must reassess the significance of the facts found by the trial court in light of the proper legal principles. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501 n. 17, 104 S.Ct. 1949, 1960 n. 17, 80 L.Ed.2d 502 (1984) ("A finding of fact in some cases is inseparable from the principles through which it was deduced. At some point, the reasoning by which a fact is 'found' crosses the line between application of those ordinary principles of logic and common experience which are ordinarily entrusted to the finder of fact into the realm of a legal rule upon which the reviewing court must exercise its own independent judgment."), *quoted in Davis,* 564 A.2d at 35 n. 2.

4. In *Kearns,* appellant sued a storage company for conversion of personal property he had left to be stored by the company. In *Block,* appellant sued appellee for conversion of refrigerators that appellant claimed to own and that appellee had found in a building that appellee had razed at the direction of the District government.

### A.

In determining that Equity had relinquished all its rights to the software collateral, the trial court failed to consider any of the implications of Equity's status as a secured creditor under U.C.C. Article 9. Instead, the trial court relied entirely on the law of abandonment, as set forth in *Kearns v. McNeill Bros. Moving & Storage Co.,* 509 A.2d 1132 (D.C.1986):

Abandoned property is that to which the owner has voluntarily relinquished all right, title, claim, and possession, with the intention of terminating his ownership, but without vesting it in any other person and with the intention of not reclaiming future possession or resuming its ownership, possession or enjoyment.

*Id.* at 1136 (quoting 1 Am.Jur.2d *Abandoned, Lost, and Unclaimed Property* § 1, at 3–4 (1962)). While *Kearns* and *Block v. Fisher,* 103 A.2d 575 (D.C.1954), also cited by the court, are not wholly irrelevant to this case, *see infra* note 5, neither concerned a secured transaction,[4] and, therefore, neither *Kearns* nor *Block* provides an adequate legal foundation for determining whether Equity intended to abandon the software collateral. On the contrary, we believe that Equity's intent can only be assessed properly in light of the provisions of U.C.C. Article 9 (D.C.Code §§ 28:9–101 to –507 (1991 Repl.)) and related caselaw.

■■ "To constitute implied waiver [of a security interest], there must exist unequivocal acts or conduct evidencing an intent to waive; waiver will not be inferred from doubtful or ambiguous factors." *Central Washington Bank v. Mendelson–Zeller, Inc.,* 113 Wash.2d 346, 779 P.2d 697, 701 (1989) (citations omitted).[5] Except in

5. *Accord, First Interstate Bank v. Interfund Corp.,* 924 F.2d 588, 595 (5th Cir.1991) (interpreting Texas law); *Vogel v. Carolina Int'l, Inc.,* 711 P.2d 708, 711–12 (Colo.Ct.App.1985); *Washburn v. Union Nat'l Bank & Trust Co.,* 151 Ill. App.3d 21, 104 Ill.Dec. 242, 245, 502 N.E.2d 739, 742 (1986); *In re Estate of Angiulli,* 148 Misc.2d 796, 561 N.Y.S.2d 626, 629 (Sur.Ct.1990), *aff'd,* 178 A.D.2d 948, 580 N.Y.S.2d 889 (App.Div. 1991). It is worth noting that *Kearns* also pro-

cases where estoppel or laches may apply, a secured creditor's mere inaction does not constitute an implied waiver of its rights. *See Washburn v. Union Nat'l Bank & Trust Co.,* 151 Ill.App.3d 21, 104 Ill.Dec. 242, 245, 502 N.E.2d 739, 742 (1986).[6] Nor does the secured creditor necessarily waive its security interest by allowing the debtor to retain possession of collateral and use it in the ordinary course of business. *See National Acceptance Co. of America v. Virginia Capital Bank,* 491 F.Supp. 1269 (E.D.Va.1980). In short, an affirmative act implying waiver of a security interest is usually required.

■ Furthermore—and of crucial significance here—a secured creditor does not waive its rights in collateral by initially suing on the debt instead of seeking immediate repossession. "[A] secured creditor's effort to collect its debt through the judicial process will not 'operate to destroy his [or her] security interest vis-a-vis the debtor....' " *State Bank of Piper City v. A–Way, Inc.,* 115 Ill.2d 401, 105 Ill.Dec. 452, 454, 504 N.E.2d 737, 739 (1987) (quoting 2 G. GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY § 43.7, at 1209–10 (1965), other citation omitted).[7] Significantly, D.C.Code § 28:9–501(1) explicitly provides that a secured creditor's remedies are cumulative.[8] This section of U.C.C. Article 9 abolished the old common law doctrine of election of remedies, so that "a secured creditor may first attempt to enforce his [or her] rights by one method and if that proves unsuccessful follow another one...." 2 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 27–4, at 572 (3d ed. 1988). In other words, until the debt is satisfied, a secured creditor is free to pursue all available remedies.[9] It follows that a secured creditor may still proceed against collateral even after the creditor has already won a judgment on the debt.[10]

pounds a similarly stringent standard concerning abandonment: " 'there must be a clear and unequivocal intent to abandon on the part of the owner, and the burden is on him who alleges abandonment to establish that intent.' " 509 A.2d at 1136 (quoting *International Finance Corp. v. Jawish,* 63 U.S.App.D.C. 262, 263, 71 F.2d 985, 986 (1934)). In *Kearns,* we concluded that this standard had not been satisfied and reversed the trial court's dismissal of the owner's suit. In relying on *Kearns* in this case, however, the trial court does not appear to have considered this requirement that there be a showing of "a clear and unequivocal intent to abandon."

**6.** *See also Brown v. Arkoma Coal Corp.,* 276 Ark. 322, 634 S.W.2d 390, 392 (1982) (one-and-a-half-year delay of secured party in filing replevin suit after judicial sale of collateral did not constitute waiver of security interest). *Cf. Yamaha Motor Corp. v. Tri–City Motors & Sports, Inc.,* 171 Mich.App. 260, 429 N.W.2d 871, 876–78 (1988) (secured creditor's two-year delay in asserting rights did not breach any duty of good faith owed to second secured party). *But see Fifth Third Bank v. West,* 42 Ohio Misc.2d 26, 537 N.E.2d 262 (Mun.Ct.1988) (bank's ten-year delay in attempting to recover on defaulted car loan barred bank's suit).

**7.** *See also, e.g., In re Adrian Research & Chem. Co.,* 269 F.2d 734 (3d Cir.1959); *In re Hill,* 472 F.Supp. 844 (D.Kan.1979), *aff'd,* 648 F.2d 1282 (10th Cir.1981); *Ceres Fertilizer, Inc. v. Beekman,* 209 Neb. 447, 308 N.W.2d 347 (1981); *Ruidoso State Bank v. Garcia,* 92 N.M. 288, 587 P.2d 435 (1978).

**8.** D.C.Code § 28:9–501(1) reads in pertinent part:

When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this part and except as limited by subsection (3) those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure.... The rights and remedies referred to in this subsection are cumulative.

**9.** There remains some disagreement as to whether the secured creditor may seek both repossession and a judgment simultaneously. *See* 2 WHITE & SUMMERS § 27–4, at 572–73. We need not decide that issue here.

**10.** *See In re Hill, supra* note 7 (holding that creditor bank that had taken only a personal judgment against a bankrupt debtor had not thereby lost its status as a secured creditor); *State Bank of Piper City v. A–Way, Inc.,* 115 Ill.2d 401, 105 Ill.Dec. 452, 504 N.E.2d 737 (1987), (allowing the creditor bank to maintain an action to enforce its security interest notwithstanding the fact that (1) this action was filed eight months after the bank had obtained a judgment against the debtor and (2) the collateral sought by the creditor had been mistakenly omitted in the plaintiff's prior motion to enforce the judgment); *Ruidoso State Bank v. Garcia, supra* note 7, (permitting creditor bank to seek replevin of two vehicles that secured loan in order to satisfy previously won default judgment on that loan); *In re A & E Products, Ltd.,*

Indeed, D.C.Code § 28:9–501(5) suggests that, far from waiving a creditor's rights in collateral, a suit on the debt serves to maintain the creditor's security interest. The first sentence of this section provides that, "[w]hen a secured party has reduced his [or her] claim to judgment the lien of any levy which may be made upon his [or her] collateral by virtue of any execution based upon the judgment shall relate back to the date of the perfection of the security interest in such collateral." Paragraph 6 of the U.C.C. Official Comment to Section 9–501 notes that this sentence "makes clear that any judgment lien which the secured party may acquire against the collateral is, so to say, a continuation of his [or her] original interest (if perfected) and not the acquisition of a new interest or a transfer of property to satisfy an antecedent debt." 9 RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 9–501:1, at 622 (3d ed. 1985). While these provisions are intended to deal with situations where creditor priority is an issue, they also suggest that a suit on the debt itself will ordinarily preserve the creditor's rights to the collateral just as if the creditor had actually foreclosed.

### B.

■ With this legal background in mind, we turn now to the facts of the case before us. In this case, there is no evidence in the record that Equity took any affirmative action manifesting an intent to abandon its security interest in the collateral. In concluding, nonetheless, that Equity had relinquished its interest in the collateral, the trial court relied entirely on circumstantial proof and passive behavior, focusing primarily on Equity's delay in seeking the return of the software. In light of the legal standards set forth above, however, we must disagree with the trial court's ruling.

Equity's decision to rely on its suit for a monetary judgment as the initial means of recovering the debt owed by Carroll, and its subsequent decision to repossess hardware as an additional means of satisfying that debt, did not mean that Equity waived its rights in the remaining (software) collateral in Carroll's possession. In light of Carroll's apparent refusal and/or inability[11] to tender the software, it was not unreasonable for Equity to focus on its suit rather than on repossession of the software. But that choice does not mean that Equity had made, or was obliged to make, an irrevocable election of remedies.

Moreover, in assessing the significance of Equity's delay in enforcing its security interest, we must consider the fact that during the entire time that Equity was supposedly sleeping on its rights, its suit was still pending. Equity's contempt motion, although not filed until April 1985—more than eighteen months after Equity initially obtained the court order authorizing repossession of collateral—still predated the trial of its suit, which did not begin until September 1985. If, as both D.C.Code § 28:9–501(5) and the caselaw indicate, a secured creditor may wait until *after* the resolution of its suit before levying on the collateral, then surely Equity cannot be said to have abandoned its interest in the software simply because it did not file the contempt motion until five months *before* its suit came to trial.

We note, further, that filing the contempt motion was not the first action Equity took with respect to the software. While the trial court found that Equity's

---

49 B.R. 120 (Bankr.C.D.Cal.1985) (holding that where a secured creditor initially raised a repossession claim as part of its complaint to recover on a loan but failed to obtain a writ of possession in the resulting court order, this failure did not bar the creditor from recovering the secured property). Such successive remedies are not barred by *res judicata,* it has been said, because of the provision in Section 9–501(1) that remedies shall be cumulative. *See Hill v. Bank of Colorado,* 648 F.2d 1282, 1286 (10th Cir.1981); *A–Way,* 105 Ill.Dec. at 455, 504 N.E.2d at 740; 2

WHITE & SUMMERS § 27–4, at 573 n. 22. Of course, the creditor may not obtain a double recovery by executing a levy on the judgment *and* separately repossessing the collateral.

11. In its order of September 22, 1987, the trial court decided not to hold Carroll in contempt for failure to comply with the repossession order because Carroll would have been unable to identify and return this software.

agent did not specifically ask for the return of the software on September 29, 1983, the software was listed in the actual repossession order. Indeed, in its original Opinion and Order of September 22, 1987, the trial court found that the repossession order covered both the hardware and the software components of the system financed by Equity and that Carroll failed to comply with this order. This court order, therefore, evidenced that Equity had at least some interest in repossessing the software.

The trial court also based its finding of abandonment on the belief that the software was of "doubtful value." The court noted, first of all, that appellants are passive investors with no apparent interest in software designed for a small publishing firm. That point is only marginally significant in comparison to the crucial question whether the software had commercial value. On this issue the trial court, taking judicial notice of the "vast changes in microcomputer technology over the last decade," did not credit Equity's assertions that the software would find a ready market. But there was no testimony on this issue, nor did the trial court cite any evidence in the record to support its position.

■ In sum, the evidence that Equity waived its rights to the software collateral is, at best, doubtful and ambiguous and, therefore, does not satisfy the proper standard for finding an implied waiver of a security interest. While Equity did not seek to enforce its rights as assiduously as it might have, on two occasions—when it sought the repossession order and when it filed the contempt motion—it had manifested its intent to rely on the software as a means of recovering on Carroll's debt.

Given the pendency of Equity's suit on this debt (which, if Equity had prevailed, would have entitled Equity to execute a levy on this collateral in any case), and in the absence of any other evidence demonstrating estoppel [12] or a positive intention to relinquish its interest in the software, we must conclude that Equity's delay was not an adequate ground for stripping it of its rights to the software. Accordingly, we conclude that, in light of the legal standard for determining when a security interest has been waived, the trial court's finding that Equity had relinquished its rights to the software collateral cannot be sustained under our standard of review. *See* D.C.Code § 17–305(a) ("plainly wrong"); *Fleming I*, 581 A.2d at 1222; *see also* Super Ct.Civ.R. 52(a) ("clearly erroneous"); *Bose Corp.*, 466 U.S. at 499, 104 S.Ct. at 1959 (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

It follows that Equity is entitled either to repossess the software collateral remaining in Carroll's possession or to recover the reasonable value thereof. *See Fleming I*, 581 A.2d at 1227 n. 18; *In re Gerber*, 51 B.R. 526, 529 (Bankr.D.Neb.1985) (holding that secured creditor whose failure to give notice of sale of repossessed collateral barred any deficiency judgment was not precluded from repossessing remaining collateral or seeking compensation for value of that collateral).

Neither of these remedies is necessarily foreclosed by the fact that the trial court found, in its first order in 1987, that the evidence concerning the software collateral's existence and value was inadequate.[13] With regard to the questions of what soft-

---

**12.** The proponent of an equitable estoppel claim must demonstrate that he or she "changed his [or her] position prejudicially in reasonable reliance on a false representation or concealment of material fact which the party to be estopped made with knowledge of the true facts and intent to induce the other to act." *Nolan v. Nolan*, 568 A.2d 479, 484 (D.C.1990). *See also Cassidy v. Owen*, 533 A.2d 253, 255 (D.C.1987). Finding that "Carroll ha[d] not shown that Equity failed to demand the return of the software with the intention that Carroll would rely upon his continued possession of it," the trial court rejected appellee's claim that Equity was es-

topped from asserting its security interest. Appellee does not challenge that ruling.

**13.** In its September 22, 1987 Order, the trial court stated that "[f]rom the evidence before it, the Court has no way of ascertaining what, if any, software covered by the original lease still exists and thus cannot order its return." Furthermore, the court held that Equity had not "presented sufficiently exact evidence of the software's value to enable the court to make ... an award" of the software's value. *See also supra* note 11.

ware Equity might be entitled to repossess, and whether that software might include modifications and revisions made after the date of Carroll's default, this court held in *Fleming I* that the trial court's rulings were inadequately supported, and, therefore, we remanded this issue for further consideration. 581 A.2d at 1226–27 & nn. 16–17. As for the monetary value of the software collateral, we noted in *Fleming I* that Equity's possible failure to develop sufficiently exact evidence on this point might "preclude a second bite at the apple." *Id.* at 1227 n. 18. But, we did not actually so hold, and, given its ruling that Equity had abandoned the software, the trial court did not reach this issue on remand. Furthermore, we note that there may be some question as to whether Equity was necessarily obliged to develop evidence at trial concerning the value of the software collateral, given that its suit was on the debt, not an action to repossess the software.

## IV.

◼ Paragraph 11 of the lease agreement between the parties provided that, in the event of Carroll's default, Carroll would be liable for "expenses of collection, including reasonable attorney's fees." *Fleming I*, 581 A.2d at 1227. As we noted above, in *Fleming I* we questioned the trial court's original fee award and asked the court to reconsider the award in light of our conclusion that even contractually based provisions for attorney's fees are subject to reduction where the defendant has successfully asserted defenses or counterclaims. 581 A.2d at 1227–29. On remand, the trial court denied Equity any attorney's fee award. Equity now argues that, insofar as it is successful in its claimed right to repossess the software

collateral, Equity should also receive reasonable attorney's fees related to this endeavor. Given our conclusion that Equity has retained its rights to the software collateral, we agree that the trial court must reexamine the question of attorney's fees. The vindication of Equity's right to the software collateral represents a victory sufficient to meet the threshold requirement that, in order to be entitled to attorney's fees, a party must prevail on the merits.[14] Of course, as we held in *Fleming I*, in determining an appropriate award the trial court must also take into consideration the fact that Equity's suit was only partially successful.

◼ As for Equity's alternative argument for attorney's fees under Rule 11, that claim is foreclosed by Equity's failure to raise the point on the first appeal. "[W]here an argument could have been raised on an initial appeal, it is inappropriate to consider that argument on a second appeal following remand." *Northwestern Indiana Tel. Co. v. F.C.C.*, 277 U.S.App. D.C. 30, 35, 872 F.2d 465, 470 (1989), *cert. denied*, 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990).

## V.

In light of our conclusions, we affirm the trial court's ruling that Equity is not entitled to a deficiency judgment for the prorated portion of the debt attributable to the software, reverse the trial court's determination that Equity has abandoned its security interest in the software, and remand this case to the trial court (1) to order an appropriate remedy, *i.e.*, either the return to Equity of the software collateral in Carroll's possession or the payment by Carroll of the reasonable value thereof,[15] and (2) to

---

14. "To be deemed a 'prevailing party,' it is necessary only that the plaintiff 'succeed on any *significant* issue in litigation which achieves *some of the benefit* the parties sought in bringing the suit.' " *District of Columbia v. Jerry M.*, 580 A.2d 1270, 1274 (D.C.1990) (quoting *Allen v. District of Columbia*, 503 A.2d 1233, 1236 (D.C. 1986); emphasis in *Allen;* other citations omitted). *See also* Herbert B. Newburg, Attorney Fee Awards § 3.03, at 110 (1986) ("Plaintiffs who obtain only nominal or modest relief are con-

sidered prevailing parties for fee award purposes.").

15. For guidance in determining whether the software collateral includes any modification by Carroll, we refer the trial court to *Fleming I.* There we said:

To the extent that the security agreement gave Equity any *rights in the software as its form permutated*, those rights should remain the

award to Equity such attorney's fees as the court shall find reasonable and proper in light of Equity's partial success in this case.

*Affirmed in part, reversed in part, and remanded for further proceedings.*

same before and after default.... [Equity's] Article 9 security interest in the unrepossessed collateral continued until the debt was paid, absent an express or implied relinquishment of the security interest.

581 A.2d at 1226 (footnote omitted). We noted further that Equity's rights to modifications in the software may be governed by D.C.Code §§ 28:9–314 and 9–315, which concern a secured creditor's interest in accessions to collateral or property that is commingled with collateral. *Id.* at 1227 n. 17. For instance, D.C.Code § 28:9–315(1) provides that "If a security interest in goods was perfected and subsequently the goods or a part thereof have become part of a product or mass, the security interest continues in the product or mass if (a) the goods are so manufactured, processed, assembled, or commingled that their identity is lost in the product or mass...."