*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 23-CV-0516 & 23-CV-0775

DCA CAPITOL HILL LTAC, LLC, *et al.*, APPELLANTS,

v.

CAPITOL HILL GROUP, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2015-CA-008166-B)

(Hon. John M. Campbell, Trial Judge)
(Hon. Juliet J. McKenna, Motions Judge)

(Argued October 31, 2024                    Decided March 6, 2025)

*Michael J. Edney*, with whom *Mark Oakes* was on the brief, for appellants.

*Stephen M. Shepard*, with whom *Lexie G. White*, *Halley W. Josephs*, and *Christopher A. Glaser* were on the brief, for appellee.

Before BECKWITH and SHANKER, *Associate Judges*, and RUIZ, *Senior Judge*.

SHANKER, *Associate Judge*: Appellants DCA Capitol Hill LTAC, LLC and DCA Capitol Hill SNF, LLC (collectively, "DCA") leased from appellee Capitol Hill Group ("CHG") a property in Northeast Washington, DC, for purposes of operating a long-term acute care hospital and skilled nursing facility. In 2015, DCA began withholding rent payments to CHG on the ground that DCA was unsatisfied

with CHG's installation of a new heating, ventilation, and air conditioning ("HVAC") system and a new generator in the building. CHG sued in Superior Court, claiming breach of contract by DCA, and DCA brought counterclaims for declaratory relief, breach of contract, and fraud. DCA's fraud counterclaims alleged four misrepresentations made before it signed the lease and one misrepresentation in the lease itself.

Before trial, the trial court granted summary judgment to CHG on the portions of DCA's fraud counterclaims pertaining to pre-lease-signing representations, on the ground that those allegations failed as a matter of law due to integration clauses in the lease. After a bench trial, the court entered judgment for CHG on CHG's breach-of-contract claim, DCA's breach-of-contract counterclaim, and the portions of DCA's fraud counterclaims alleging a misrepresentation in the lease. The trial court then awarded CHG its attorneys' fees based on an attorneys' fee provision in the lease.

DCA now challenges all of those rulings. First, DCA asserts that the trial court erred in granting CHG summary judgment on the aspects of DCA's fraud claims alleging misrepresentations before DCA entered into the lease because those claims were not foreclosed by the lease's integration clauses. Second, DCA contends that it properly withheld rent from CHG pursuant to a lease provision

allowing DCA to withhold rent based on objections to the HVAC system and generator work. Third, DCA argues that the trial court abused its discretion in awarding CHG its attorneys' fees because CHG did not prevail on its damage-calculation theory, resulting in a lower damages award than CHG had sought.

We affirm. We hold that DCA's fraud claims alleging pre-lease-signing misrepresentations that induced entry into the lease fail as a matter of law because DCA's reliance on any alleged misrepresentations was unreasonable. We then conclude that DCA breached the lease by withholding rent because its objections to the HVAC system and generator work pertained to issues outside the scope of the work as both parties understood it; for the same reason, the trial court correctly denied DCA's fraud claims to the extent they alleged a within-lease misrepresentation about the HVAC and generator work. Finally, we hold that the trial court did not abuse its discretion in awarding CHG its attorneys' fees, as CHG was the prevailing party entitled to attorneys' fees under the lease. We remand to the trial court so that it can consider whether to award CHG attorneys' fees associated with this appeal.

# I.     Background

We begin with the relevant pre-lease conduct, which is pertinent to DCA's fraud claims and construction of the disputed lease terms.  We then detail the applicable lease provisions and recount the parties' conduct after they entered into the lease.  Finally, we provide an overview of the procedural background, including summary judgment, the post-bench trial findings of fact and conclusions of law, and the attorneys' fees award.

## A.     Pre-Lease Conduct

Certain matters relevant to this dispute arose between CHG and the property's previous tenant, Specialty Hospital of Washington.  During Specialty Hospital's lease, CHG began replacing the hospital's HVAC system and contracted with Specialty Hospital to that end.

### 1.     CHG plans to replace the HVAC system

When CHG bought the building located at 700 Constitution Avenue, NE, it planned to develop half of the building into apartments, while the other half would continue operating as a hospital.  This plan had an unavoidable complication: the building's HVAC system—three gas-fired boilers, two chillers, and two water pumps—was located in the apartment parcel's basement.  CHG needed to

"decouple[ ]" the HVAC system so that each building parcel would have its own HVAC system.

In August 2013, CHG leased the apartment parcel to 700 LLC, which would develop the apartments. At that time, Specialty Hospital was the tenant in the hospital parcel, so CHG amended its original lease with Specialty Hospital to reflect the apartment development's impact on the HVAC system. The amendment stated that CHG "shall cause to be installed a new HVAC system" in the hospital parcel "serving only" the hospital parcel. The new HVAC system was described as the "New Systems" and defined by "Rider A." Rider A defined the new systems as a list of seven components, including, among other things, a "[g]as-fired sectional or fin-tube boiler(s)," "[a]ir cooled chillers," "circulation pumps," and "[p]iping and fittings for proper operation and connection to the existing distribution system." CHG was responsible for installing these new components, but Specialty Hospital would reimburse CHG through increased rent.

Along with the lease amendment, CHG and Specialty Hospital established an easement through a Declaration of Temporary Easements and Agreement. The easement agreement gave the apartment developer (700 LLC) a right of access to install the new HVAC components in the hospital parcel's basement. Construction

on the new system began shortly after the lease amendment and easement agreement were executed in August 2013.

## 2.	Lease negotiations

In early 2014, Specialty Hospital was facing bankruptcy. After learning of Specialty Hospital's financial distress, Silver Point Capital, LLC (which owns DCA's parent company, BridgePoint HealthCare, LLC) began discussions with Specialty Hospital to buy its assets in bankruptcy. Silver Point also began negotiations with CHG for Silver Point to assume Specialty Hospital's lease for the hospital property. In connection with these negotiations, Silver Point began a due diligence investigation, which included touring the hospital property and learning about the ongoing construction for the new HVAC system project. During those tours, Silver Point representatives were sometimes accompanied by Specialty Hospital executives and other times by CHG's personnel. Specialty Hospital's CEO testified that these tours included discussions about the hospital's outdated air distribution system, which needed to be replaced and would not be replaced by Specialty Hospital or CHG.

By April 2014, CHG and Silver Point began negotiating the terms of a landlord sale support agreement term sheet. That term sheet was a preliminary agreement that "lock[ed] up" CHG's support for Silver Point's bid in Specialty

Hospital's bankruptcy proceedings. The term sheet included a $4.5 million payment to CHG to cure the debts that Specialty Hospital owed CHG and committed DCA and CHG to signing a new lease. The term sheet's provision relating to the $4.5 million cure payment does not refer to the HVAC system.

At trial, CHG's founder explained that during the term sheet negotiations, CHG clarified that the HVAC system project involved replacing only the HVAC equipment that was located in the apartment parcel, to decouple the two parts of the building. Also, before signing the term sheet, Silver Point received the lease between Specialty Hospital and CHG, including the lease's HVAC-system amendment and Rider A to that amendment.

After CHG and Silver Point signed the term sheet, CHG sent Silver Point the easement agreement, which described the scope of the HVAC work. CHG also took a Silver Point executive on an in-depth tour of the hospital building, pointing out problems with various components of the building's air distribution system. During negotiations over the lease with CHG, Silver Point considered inserting language that required the new HVAC systems to "work with [the hospital's] existing systems," but that language was not included in the final signed lease.

### 3.   Fraud allegations

DCA alleges that, during the lease negotiations, CHG represented that the new HVAC system for the hospital was costing it more than $5 million and was "state of the art."   According to DCA, CHG's HVAC-related costs were capped at $2.7 million based on CHG's agreement with the apartment developer, which it had entered into before its representations to DCA.   After the representations by CHG, DCA agreed to the term sheet, which provided for the $4.5 million cure payment to CHG described above.

### 4.   CHG installs a new generator and new HVAC system

While lease negotiations were ongoing and the HVAC system was being decoupled, CHG also conducted work on one of the hospital's generators.   The hospital had three generators to provide backup power in case of a general power failure.   Two of the generators, known as Generators #3 and #4, were not moved or replaced.   The third generator, Generator #5, was new and was installed in the hospital by CHG.   Before DCA and CHG signed the lease in mid-December 2014, CHG sought reimbursement of the "generator costs" from DCA.   DCA reimbursed the cost for Generator #5 at closing.

CHG also installed a new HVAC system in the hospital parcel consisting of three gas-fired boilers, two chillers, and two water pumps. CHG did not, however, replace the existing distribution components that connected the new HVAC system throughout the hospital parcel.

## B.      The Lease

At the end of 2014, CHG and DCA signed a lease agreement. The lease explains that, as part of Specialty Hospital's bankruptcy proceedings, Specialty Hospital would assign the original lease (between it and CHG) to DCA. DCA, in turn, "desire[d] to continue leasing" the hospital parcel from CHG, on the amended and restated terms of the lease. This appeal primarily involves one lease term—section 8.4—but three other sections of the lease merit discussion.

### 1.      Section 8.4: New HVAC system & generator work

Section 8.4 describes four "construction projects" that CHG had "already begun" when the lease was signed. Two of those projects are at issue here—the new HVAC system and the generator work. Specifically, it was "agreed and understood by the parties" that CHG "has installed a new HVAC system within the [b]uilding." The HVAC system was at CHG's "sole expense." For the generator work, section 8.4 explains that CHG "has caused" the hospital parcel "to be served by the repair

and relocation of generators that [CHG] has caused to be installed, in the [hospital parcel] in tandem with the installation of the new HVAC."  Unlike with the HVAC system, section 8.4 states that DCA "shall reimburse" CHG "for the [g]enerator [w]ork."

The new HVAC system and generator work are described as backward-looking statements of what had already happened—"has installed" and "has caused."  These backward-looking statements contrast with the forward-looking, promise-type language for the other two construction projects described in section 8.4.  For those two projects, CHG was to "construct a ramp and awning" and "construct the auditorium."

Under section 8.4, with respect to the HVAC system and the generator, DCA was to "provide its acceptance of such installation or notify [CHG], in writing, of any matters" to which DCA "objects in connection with such installation, no later than the ninetieth (90th) day following" the lease's execution.  If DCA objected, CHG could either dispute the matters to which DCA objected or "use commercially reasonable efforts to correct" the matters.  If CHG failed to dispute or correct the matters, DCA could "correct such matters" and then withhold from its rent the costs of correction.

Section 8.4 is an exception to section 8.1, which states that DCA accepts the property in its "AS-IS, WHERE-IS, WITH ALL FAULTS condition, without representation or warranty of any kind," unless a lease provision stated otherwise. Similarly, section 8.1 states that CHG "is under no obligation to make" any additions or improvements to the property. Also, section 8.4's rent-withholding provision is an exception to section 14.4, which states that if "at any time during" the lease term, DCA has "a claim against" CHG, DCA "shall not have the right to deduct the amount allegedly owed to [it] from any rent or other sums payable to [CHG]."

### 2. Incorporated easement

The lease incorporated by reference the easement agreement between Specialty Hospital and CHG. The easement agreement defines the term "New HVAC and Generator System" as "the new mechanical and generator equipment and system . . . generally conforming to the project scope" defined in an Exhibit D.[1] Exhibit D defines "[i]n general the HVAC system" with a list of seven components, such as a "[g]as-fired sectional or fin-tube boiler(s)," "[a]ir cooled chillers,"

---

[1] DCA points out that CHG omitted Exhibit D as an attachment when it sent the lease to DCA. The trial court, however, found that the easement agreement was recorded with the D.C. Recorder of Deeds and was "readily available" to DCA throughout its lease negotiations with CHG. The court concluded that it was "virtually impossible to believe" that DCA was not aware of Exhibit D before signing the lease.

circulation pumps, and piping and fittings "for proper operation and connection to the existing distribution system."

### 3. Integration clauses

The lease contains two integration clauses. These clauses state that DCA is not relying on any prior oral or written representations by CHG and that the lease supersedes all prior agreements, negotiations, and discussions between the parties.

### 4. Attorneys' fees provision

The lease also contains an attorneys' fees provision. That provision states:

> If [CHG or DCA] is required or elects to take legal action against the other party to enforce the provisions of this Lease and a judgment is rendered in such action by a court of competent jurisdiction, then the prevailing party in such action shall be entitled to collect from the other party its reasonable costs and expenses in connection with such legal action (including reasonable attorneys' fees and court costs).

### C. Post-Lease Conduct

Under the lease's section 8.4, DCA was obligated to either accept the installation of the new HVAC system and generator work or notify CHG "of any matters to which [DCA] objects in connection with such installation." The lease provided DCA with ninety days to make its decision to accept the HVAC system and generator work or object.

Within the applicable ninety-day period, DCA expressed that it was "unable to accept the Generator and HVAC projects at this time" because it was still investigating the working condition of the units. Before DCA sent this notice, it reported to CHG that Generator #5 was having mechanical issues, which it reiterated in its notice. CHG arranged for Generator #5 to be fixed at no cost to DCA. Later, DCA encountered problems with the two older generators (Generators #3 and #4). But in various communications, DCA indicated that Generators #3 and #4 were its responsibility to repair. With respect to the HVAC system, DCA asserted that it had been unable to run certain tests due to cold weather.

Almost six months after stating that it was "unable" at that time to "accept" the new HVAC system, DCA sent a letter to CHG complaining about issues with the hospital's HVAC distribution components, including the air handler units and fan coil units. This was the first time that DCA expressed its position that the "new HVAC system" included replacement of the distribution components.

Based on the issues with Generators #3 and #4 and the HVAC distribution components, DCA began withholding rent. It withheld over $1.2 million—including just over $53,000 for HVAC-related expenses and $131,000 for renting temporary backup generators.

## D.    Procedural History

CHG filed this lawsuit against DCA in Superior Court.  CHG alleged that DCA breached the lease by improperly withholding rent.  DCA answered that it was entitled to withhold rent under the lease agreement based on CHG's failure to replace the HVAC distribution components.  DCA also counterclaimed for declaratory relief, breach of contract, and fraud.  The breach-of-contract claim was based on CHG's alleged failure to upgrade all components (including the distribution components) of the HVAC system.  DCA presented two fraud-related counterclaims—fraudulent misrepresentation and fraud against DCA and the bankruptcy estate—but the counts were identical.  The counts alleged five misrepresentations by CHG, four of which were made before DCA signed the lease and one of which (about the HVAC and generator work that had already been done) was in the lease.  DCA ultimately withdrew the counterclaim alleging fraud against DCA and the bankruptcy estate, at least to the extent it alleged fraud against the bankruptcy estate.

### 1.    Summary judgment

After DCA unsuccessfully sought to remove the case to federal bankruptcy court, the parties cross-moved for summary judgment on several claims.  As relevant here, CHG moved for summary judgment on DCA's fraud-related claims, which

were premised on CHG's alleged misrepresentations about the cost of the HVAC work. CHG argued that those claims failed as a matter of law based on the lease's integration clauses.

At a hearing, the trial court indicated that it would "be concluding that the integration clauses in the contract do take care of and eliminate any arguments about fraud in the inducement given the sophistication of the parties" and "the detail in those clauses," and that it would "be granting summary judgment to [CHG] on that fraud claim." The trial court reiterated this conclusion just before trial started, noting that it had previously ruled that "the fraud counterclaims based on alleged misrepresentations before the lease was signed in December of 2014" were "handled by the integration clauses in the contract" and that "the fraud counterclaim, at least as it pertains to misrepresentations before the lease was signed, is out of the case as a matter of law" and "handled by the integration clauses in the contract." It appears that the trial court declined to rule as a matter of law on the aspect of DCA's fraud claims relating to the representation in the lease itself about the HVAC and generator work.[2]

---

[2] Although the trial court made clear just before trial that portions of DCA's fraud claims were out of the case as a matter of law, it did not enter a separate summary judgment order as to those portions of the claims and instead denied the counterclaims in their entirety in its final judgment after trial.

## 2.    Bench trial

The trial court held a five-day bench trial on the breach-of-contract claims and the remaining aspect of DCA's fraudulent misrepresentation claim. The court admitted approximately 125 exhibits and heard testimony from twelve witnesses—five for CHG and seven for DCA. Trial testimony revolved around whether CHG fulfilled its obligation to install a "new HVAC system" when it installed new gas-fired boilers, chillers, and water pumps, or if it was also obligated to replace the existing distribution components. If the "new HVAC system" did not encompass the distribution components, then DCA had breached by improperly withholding rent based on complaints about those components. DCA also raised, for the first time,[3] that CHG was responsible for all three generators, including Generators #3 and #4. Because CHG had replaced only Generator #5, DCA argued that CHG had not fulfilled its obligation to complete the required generator work.

Over three years after the bench trial concluded, the trial court ruled in CHG's favor on every claim and counterclaim. In findings of fact and conclusions of law, the court noted that the lease did not contemplate a future installation of a "new HVAC system" but rather said that CHG had already installed the system, and that "[a]s used and as understood by the parties, this phrase did not include the air

---

[3] DCA referenced only a single ("a" or "the") generator in its counterclaims.

distribution components . . . ." The court observed that DCA knew or should have known what CHG had and had not installed, both from its visual inspections and the relevant documents. Similarly, the trial court found that CHG had fulfilled its generator-related obligation under section 8.4 by installing a new generator—Generator #5. The court emphasized that DCA had effectively acknowledged that Generators #3 and #4 were its responsibility to repair.

The trial court reiterated in its findings of fact and conclusions of law that DCA's fraud claims related to misrepresentations before DCA entered into the lease were "barred by the lease's integration clauses," adding that "the parties here were sophisticated players." The court then denied the remaining aspects of DCA's fraud claims—alleging a misrepresentation in the lease itself—for the same reasons the court ruled in CHG's favor on the contract claims:

> The evidence at trial was overwhelming that the HVAC project was effectively defined in documents attached to or referenced in the final lease; that Silver Point representatives had actual notice of the scope of the new HVAC project; that Silver Point had ample opportunity, and every incentive, to conduct an independent investigation into the scope and cost of the HVAC system project; and that CHG did not have exclusive access to this information.

The trial court also concluded that the lease provided for late fees and interest, and that the late charges were to be calculated monthly, on the entire amount due,

including on previously accumulated late charges. And the court determined that CHG was "the prevailing party" in the lawsuit and was entitled to reasonable attorneys' fees.

### 3. Post-trial motions

DCA moved for reconsideration of the court's late-fees and interest determination. The trial court granted the motion to reconsider, concluding that CHG was entitled to only a single late fee and that interest accrues only on the late fee. Accordingly, the court reduced the late fees and interest owed from $4,484,000 to $1,002,943, and declined to impose over $57 million in penalty payments, as requested by CHG. The trial court also granted CHG's motion for attorneys' fees, expenses, and costs, totaling roughly $2.7 million.

DCA moved to alter or amend the attorneys' fee order. DCA argued that CHG's attorneys' fee award should be reduced because CHG did not prevail on its damages calculation. The trial court denied reconsideration of the attorneys' fee award, explaining:

> The fact that [DCA] prevailed on a post-trial sub-issue concerning the proper calculation of late fees and interest does not dictate a reduction of the fee award, particularly where, as here, the litigation on this issue consumed a relatively insignificant amount of attorney time over the almost eight-year lifespan of this case and was related to

the claims on which [CHG] prevailed, namely [DCA's] breach of the lease agreement by withholding rent.

## II.    Analysis

On appeal, DCA argues first that the trial court improperly granted summary judgment against it on the pre-lease-signing aspects of its fraud-related counterclaims because those claims were not barred by the lease's integration clauses.  Second, DCA argues that the trial court incorrectly interpreted the phrases "new HVAC system" and "generator work" in the lease.  Third, DCA asserts that the trial court abused its discretion in awarding CHG the full amount of its requested attorneys' fees and costs.  We address each argument in turn.

### A.    Summary Judgment on Aspects of DCA's Fraud-Related Counterclaims

DCA's fraud-related counterclaims (fraudulent misrepresentation and fraud against DCA, with DCA having withdrawn the claim of fraud against the bankruptcy estate) rested on the allegation that CHG represented that it was spending $5 million to repair the HVAC system when CHG's costs were in fact capped at $2.7 million.  According to DCA, CHG's misrepresentation about the cost and its assertion that the system was "state of the art" drove DCA to "make a $4.5 million payment" to CHG as part of the term sheet.  DCA alleged five misrepresentations, four of which CHG allegedly made before entry into the lease and one of which was in the lease.

The trial court granted CHG summary judgment only as to "misrepresentations before the lease was signed," based on the lease's integration clauses.[4] We find no error.

### 1. Standard of review

"We review a grant of summary judgment de novo and apply the same standard used by the trial court." *Nixon v. Ippolito*, 320 A.3d 1059, 1064 (D.C. 2024). "Under this standard, the moving party has the burden of demonstrating that there is no genuine issue of material fact, after the evidence and all inferences from the evidence are drawn in favor of the non-moving party." *Id.* (quoting *Mancuso v. Chapel Valley Landscape Co.*, 318 A.3d 547, 553 (D.C. 2024)). Our role is not to resolve factual issues as factfinder, "but rather to review the record to determine if there is a genuine issue of material fact on which a jury could find for the non-moving party." *Id.* (quoting *Mancuso*, 318 A.3d at 553).

---

[4] DCA's fifth alleged misrepresentation was in the lease itself; integration clauses in the lease thus had no bearing on DCA's reliance on the misrepresentation. That alleged misrepresentation, about what the HVAC and generator work entailed, was tied up with the contractual claims, which is presumably why the trial court ruled on it after trial.

## 2. Discussion

"We have time and again imposed a 'very high standard' on sophisticated business entities" bringing fraud claims related to "arms-length transactions." *See Wash. Inv. Partners of Del., LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 575-76 (D.C. 2011) (footnote omitted) (quoting *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 931-33 (D.C. 1992)). It is "fundamental that in 'a business transaction between two sophisticated entities involving substantial sums,' as was this transaction, 'parties are bound by what they sign.'" *Id.* at 576 (quoting *GLM P'ship v. Hartford Cas. Ins. Co.*, 753 A.2d 995, 999 (D.C. 2000)). Our decisions make clear that to prevail, DCA must establish that CHG made (1) a false representation (2) in reference to a material fact, (3) with knowledge of its falsity and (4) with the intent to deceive, and that (5) an action was taken in reliance upon the representation. *Drake v. McNair*, 993 A.2d 607, 622 (D.C. 2010). DCA's fraud claims allege that the fifth element—the action that DCA took in reliance on CHG's alleged fraud and misrepresentations—was entering the term sheet and lease, thus essentially alleging fraud in the inducement of those contracts. Because those fraud claims involve a commercial contract negotiated at arm's length, there is a sixth element: "(6) that the defrauded party's reliance [was] *reasonable*." *Id.* (quoting *Hercules*, 613 A.2d at 923).

DCA's fraud claims turn on this sixth element—reasonable reliance. In the trial court's view, DCA's reliance on CHG's representation that the HVAC system was "state of the art" and cost $5 million was unreasonable because that representation did not appear in the lease, which contained two integration clauses. We have held that "an integration clause does not provide a blanket exception to claims of fraud in the inducement." *Id.* at 624. That is because such a rule would "leave swindlers free to extinguish their victims' remedies simply by sticking in a bit of boilerplate." *Id.* (quoting *Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995)). But that does not mean that integration clauses are irrelevant when determining whether a party reasonably relied on a false representation. Instead, when "a written contract contains an incorporation clause, any alleged prior representations that a party will or will not do something in the future that are not included in that written contract generally do not support a fraud-in-the-inducement claim." *Id.* On the other hand, when the representations "conceal prior fraudulent conduct," a fraud claim may survive in the face of an integration clause. *See id.*

CHG's alleged misrepresentations—about how much it was spending on the HVAC system and the system being "state of the art"—were arguably representations about prior fraudulent conduct. But our analysis does not end there. We are mindful that in this case, "[b]oth parties were represented by counsel, and '[e]ach side presumably had the opportunity to make a variety of representations,

promises, and offers . . . [and] could have conditioned its agreement on the explicit inclusion of those representations in the contract.'" *Wash. Inv. Partners*, 28 A.3d at 575-76 (alterations in original) (quoting *Hercules*, 613 A.2d at 923). If DCA considered the $5 million and "state of the art" assurances "important enough to induce it to agree to the contract," it could have conditioned its agreement on those assurances being included in the term sheet and lease. *Hercules*, 613 A.2d at 932.

Given these circumstances, on the undisputed facts (including those reflecting extensive pre-lease discussions and negotiations), DCA cannot show that it reasonably relied on CHG's allegedly false representations. We hold that the pre-lease-signing aspects DCA's fraud-related claims fail as a matter of law and therefore affirm the trial court's grant of summary judgment.

## B. Breach of Contract and Remaining Aspect of DCA's Fraud-Related Counterclaims

Both parties' contract claims—CHG's claim that DCA breached the lease by improperly withholding rent and DCA's claim that CHG breached the lease by failing to meet its obligations—as well as DCA's fraud claims related to lease section 8.4 turn on whether the "new HVAC system" included distribution components and whether "generator work" included replacement of all three generators.

## 1.    Standard of review

After a bench trial, we review a trial court's factual findings for clear error and its legal conclusions de novo. *Caesar v. Westchester Corp.*, 280 A.3d 176, 190 (D.C. 2022). "The proper interpretation of a contract term is a question of law," which we review de novo. *BSA 77 P St. LLC v. Hawkins*, 983 A.2d 988, 993 (D.C. 2009).[5]

---

[5] DCA argues that the "three-and-a-half years between trial and verdict rebuts any deference the trial court might receive for any factual aspects and counsels full *de novo* review on the record." We disagree. Although refined through common-law reasoning, our scope of review is statutory under D.C. Code § 17-305(a). That statute states that in reviewing a judgment after a bench trial, we review both "the facts and the law," but only set aside a factual finding that is "plainly wrong or without evidence to support it." D.C. Code § 17-305(a). There is no statutory exception to that standard of review when a trial court delays a verdict after a bench trial. DCA cites no binding authority for the proposition that an extended decision-making delay warrants de novo review. Instead, DCA cites two federal appellate decisions: *Keller v. United States*, 38 F.3d 16, 21-22 (1st Cir. 1994), and *Hollis v. United States*, 323 F.3d 330, 338 (5th Cir. 2003). But *Keller* and *Hollis* both involved much longer delays (eight and thirteen years, respectively). *Keller*, 38 F.3d at 21-22; *Hollis*, 323 F.3d at 338. In *Keller*, the court opted for "careful *de novo* scrutiny" so that it could determine whether the "prolonged delay in reaching a decision rendered the trial court's findings of fact unreliable." *Keller*, 38 F.3d at 21. But in *Hollis*, the court declined to review the record de novo. *Hollis*, 323 F.3d at 338. We similarly decline to read into the statute establishing our standard of review an unwritten exception for delayed trial court decisions.

## 2. Discussion

We construe leases of real property under established principles of contract law. *2301 M St. Coop. Assoc. v. Chromium LLC*, 209 A.3d 82, 86 (D.C. 2019) (per curiam). We first assess the contract's plain language, giving reasonable effect to the contract's parts and avoiding an interpretation that would render any part of it meaningless or incompatible with the contract as a whole. *Rose's 1, LLC v. Erie Ins. Exch.*, 290 A.3d 52, 60 (D.C. 2023). We analyze disputed terms in light of "what a reasonable person in the position of the parties would have thought the disputed language meant." *BSA 77 P St.*, 983 A.2d at 993 (quoting *1010 Potomac Assocs. v. Grocery Mfrs.*, 485 A.2d 199, 205 (D.C. 1984)); *Carome v. Carome*, 293 A.3d 1122, 1127 (D.C. 2023). Our endeavor to "ascertain what a reasonable person in the position of the parties would have thought the words of a contract meant applies whether the language is ambiguous or not." *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 299 (D.C. 2006). A reasonable person "is: (1) presumed to know all the circumstances surrounding the contract's making; and (2) bound by usages of the terms which either party knows or has reason to know." *Id.* "Extrinsic evidence may be used to 'determine the circumstances surrounding the making of the contract,' [but] it may not be relied upon to show the subjective intent of the parties absent ambiguity in the contract's language." *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009) (quoting *1010 Potomac*, 485 A.3d at 205-06).

Section 8.4 of the lease states that CHG had already (a) "installed a new HVAC system" and (b) "caused" the hospital parcel "to be served by the repair and relocation of generators that [CHG] has caused to be installed." We address each provision in turn.

### a. New HVAC system

Section 8.4 of the lease states that CHG has "installed a new HVAC system" within the hospital parcel. The parties agree that CHG installed new boilers, chillers, and pumps. But in DCA's view, the term "new HVAC system" also included the distribution components, specifically air handler units and fan coil units, which work together to distribute heated or cooled air throughout the hospital building, including to individual hospital rooms. DCA argues in the alternative that, at a minimum, the term required CHG to replace enough components of the system to make the system properly heat, cool, and ventilate the hospital. CHG responds that the term "new HVAC system" must be understood in the context of the conduct and documents related to the HVAC project. We agree with CHG and conclude that a reasonable person would have understood "new HVAC system" to include only new boilers, chillers, and pumps and not the distribution components.

To be sure, the term "new HVAC system," read in isolation, could include distribution components. HVAC means heating, ventilating, and air conditioning;

system means "a regularly interacting or interdependent group of items forming a unified whole." *System*, Merriam-Webster, https://www.merriam-webster.com/dictionary/system; https://perma.cc/92JC-YTY2. So the term "new HVAC system" could encompass every item that forms a unified HVAC system, which could include a system's distribution components. We are tasked, however, not with determining what the phrase could mean as a general matter but with what it means in the contract at issue.

We begin with the lease itself. Section 8.4 does not define "new HVAC system," but the lease incorporates the easement agreement, which provided an easement for contractors to access the property "to install the new HVAC and Generator System." The easement agreement, in turn, defined "New HVAC and Generator System" in Exhibit D. Exhibit D defined "the HVAC System" to include boilers, chillers, and pumps, with no mention of distribution components.[6] Moreover, the lease states that CHG "has installed" the new HVAC system, which

_____

[6] DCA argues that it was error for the trial court to consider Exhibit D because CHG inadvertently omitted the document when it sent the lease to DCA. We disagree. As noted above, the trial court found that the easement agreement was "readily available" to DCA throughout its lease negotiations with CHG and that it was "virtually impossible to believe" that DCA was not aware of Exhibit D before signing the lease. We see no basis to disturb these findings on appeal, as they are supported by the record. *See Lynch v. Ghaida*, 319 A.3d 1008, 1014 (D.C. 2024) (explaining that we defer to the trial court's factual findings if they are supported by the record).

is a backward-looking statement of what had already happened. So the components that CHG had already installed by the lease's signing—which did not include the distribution components—necessarily constituted the definition of "new HVAC system." And DCA knew or should have known what CHG had already installed.

We turn next to the circumstances surrounding the lease's making. The new HVAC system was installed because CHG needed to decouple the hospital and apartment parcels. That decoupling work required CHG to provide the hospital parcel with its own HVAC components that it used to share with the apartment parcel. These circumstances were clear to DCA when it toured the hospital parcel and saw the ongoing construction to replace the boilers, chillers, and pumps but not the distribution components. In addition, before signing the lease, DCA received Specialty Hospital and CHG's lease, including all amendments. One of those amendments stated that CHG "shall cause to be installed a new HVAC system" in the hospital parcel "serving only" the hospital parcel. The term "new HVAC system" was described as the "New Systems," which in turn, was defined in Rider A. Rider A defines the new systems as boilers, chillers, and pumps, with no mention of distribution components.

Accordingly, a reasonable person in the position of the parties would have understood the term "new HVAC system" to include only boilers, chillers, and

pumps and not distribution components. CHG had installed what the lease described as a "new HVAC system" by replacing the boilers, chillers, and pumps. Because CHG was not obligated to replace and had not replaced the distribution components, section 8.4 of the lease did not give DCA the right to withhold rent based on complaints about those components. We therefore affirm the trial court's determinations that CHG did not breach the lease, that DCA did breach the lease by withholding rent, and that DCA could not have been defrauded by section 8.4.[7]

### b.     Generator work

Section 8.4 of the lease stated that the parties "agreed and understood" that CHG had "caused" the hospital parcel "to be served by the repair and relocation of generators that [CHG] has caused to be installed." DCA argues that section 8.4's reference to "generators," plural, means that CHG was responsible for repairing all three of the hospital's generators. It is undisputed that CHG replaced Generator #5 but did not replace Generators #3 and #4. CHG argues that its obligation under section 8.4 was limited to the generator it replaced—Generator #5.

---

[7] Because we decide this issue on contract interpretation alone, we need not reach whether DCA's notice that the HVAC system was not working satisfied the lease's notice requirement, which was an alternative ground relied on by the trial court.

The circumstances surrounding the lease's making reveal that the parties understood that CHG had replaced only one generator (Generator #5) and not the other two generators (Generators #3 and #4). Before the parties signed the lease, CHG sought reimbursement for the "generator costs" from DCA. DCA reimbursed the cost for Generator #5 (but not Generators #3 and #4) at closing. And after the lease was signed, DCA admitted its understanding that it was responsible for Generators #3 and #4. So the circumstances surrounding the contract's making reveal that the parties understood section 8.4's generator term to mean only the replacement of Generator #5. Indeed, DCA did not assert that Generators #3 and #4 were CHG's responsibility until trial.

As with the HVAC system, the lease also described the generator work as a backward-looking statement of what had already happened, stating that CHG "has caused to be installed." This language supports the conclusion that the generator work referred to the generator that CHG had already installed, instead of imposing a future obligation with respect to the other two generators.

Given these circumstances surrounding the contract's making, the parties' conduct after the lease, and the backward-looking statement describing the generator work, a reasonable person in the parties' position would have understood that CHG had replaced only a single generator. By replacing that generator, CHG completed

what the lease describes as "generator work," rendering DCA's withholding of rent for costs relating to the two other generators improper. We therefore affirm the trial court's conclusions that DCA breached the lease by improperly withholding rent for generator-related costs and that DCA could not have been defrauded by section 8.4's representations about the generator work.

## C. Attorneys' Fees

DCA argues that we should reverse the Superior Court's attorneys' fee award because CHG did not prevail on its damage-calculation theory. Specifically, DCA asserts that the trial court was required to reduce CHG's fee award because CHG only partially succeeded with respect to the damages that it sought. CHG counters by arguing that it is the prevailing party and therefore, under the lease's attorneys' fees provision, it is entitled to its fees. CHG explains that its failure to prevail on one post-trial sub-issue—the proper calculation of late fees and interest—does not warrant reducing the attorneys' fees award.

### 1. Standard of review

We review a trial court's attorneys' fees award for abuse of discretion. *Campbell-Crane & Assocs., Inc. v. Stamenkovic*, 44 A.3d 924, 947 (D.C. 2012); *see also James G. Davis Constr. Corp. v. HRGM Corp.*, 147 A.3d 332 (D.C. 2016).

## 2. Discussion

"In interpreting contractual provisions for attorney[s'] fees, courts 'normally limit such right to the successful or prevailing party.'" *Wash. Nat'ls Stadium, LLC v. Arenas, Parks & Stadium Solns., Inc.*, 192 A.3d 581, 589 (D.C. 2018) (quoting *Fleming v. Carroll Publ'g Co.*, 581 A.2d 1219, 1228 (D.C. 1990)). When a party achieves only partial success, trial courts have the discretion to "adjust the fee to reflect" a party's level of success. *Id.* (internal quotation marks omitted).

DCA and CHG's lease provides for "reasonable attorneys' fees and court costs" to the "prevailing party" in a legal action to enforce the provisions of the lease. The trial court twice rejected DCA's argument that CHG was not the prevailing party. Because CHG prevailed on all of its claims and on all of DCA's counterclaims, we agree that CHG is the prevailing party and, under the terms of the lease, is entitled to reasonable attorneys' fees.

We find unpersuasive DCA's argument that the trial court applied the wrong legal standard because "[a] trial court must reduce a fee award for partial success" and the trial court here "was required to account for [CHG's] failure to obtain the staggering majority of its claimed damages in its attorneys' fees award." It is true that "even contractually based provisions for attorney's fees are subject to reduction where the defendant has successfully asserted defenses or counterclaims" and that

trial courts "must also take into consideration" whether a plaintiff's suit "was only partially successful." *Fleming v. Carroll Publ'g Co.*, 621 A.2d 829, 837 (D.C. 1993). But the trial court was not *required* to reduce CHG's attorneys' fee award based on partial success because CHG prevailed on all of its claims and on all of DCA's counterclaims. To be sure, the court was permitted to reduce CHG's attorneys' fee award, but it acknowledged that discretion and declined to exercise it because "the litigation on this issue consumed a relatively insignificant amount of attorney time over the almost eight-year lifespan of this case and was related to the claims on which [CHG] prevailed, namely [DCA's] breach of the lease agreement by withholding rent." That determination was within "the sound discretion of the trial court." *Wash. Nat'ls Stadium*, 192 A.3d at 587 (internal quotation marks omitted).

In sum, we perceive neither legal error nor an abuse of discretion by the trial court. We remand for the trial court to determine whether to award CHG its attorneys' fees, expenses, and costs for this appeal, under the lease's attorneys' fees provision and *Jacobson v. Clack*, 309 A.3d 571, 585 (D.C. 2024) (remanding for the trial court to consider whether prevailing party is entitled to additional attorneys' fees for appeal).

### III. Conclusion

We affirm the judgment of the trial court and remand for the court to determine whether to award CHG its attorneys' fees, expenses, and costs associated with litigating this appeal.

*So ordered.*